## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL COTTRILL | : | |
| and | : | |
| LAWRENCE E. WNUKOWSKI | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| vs. | : | NO. 02-CV-3646 |
| | : | |
| BRITNEY SPEARS | : | |
| and | : | |
| ZOMBA RECORDING CORPORATION | : | |
| ZOMBA ENTERPRISES, INC. | : | |
| ZOMBA SONGS, INC. | : | |
| and | : | |
| JIVE RECORDS | : | |
| and | : | |
| WRIGHT ENTERTAINMENT GROUP | : | |
| and | : | |
| BMG MUSIC PUBLISHING, INC., | : | |
| | : | |
| Defendants. | : | |

## O R D E R

AND NOW, this _____ day of _____, 2003, upon consideration of defendants' motion pursuant to 17 U.S.C. § 505, for an award of costs and attorneys' fees, and plaintiffs' response thereto, it is hereby ORDERED that the defendants' Motion is GRANTED and the plaintiffs are hereby ORDERED to pay to defendants costs and attorneys' fees in the amount of $_____.

BY THE COURT:

_____
Berle M. Schiller, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL COTTRILL<br>and<br>LAWRENCE E. WNUKOWSKI | : |
| Plaintiffs, | :   CIVIL ACTION |
| | : |
| vs. | :   NO. 02-CV-3646 |
| | : |
| BRITNEY SPEARS<br>and<br>ZOMBA RECORDING CORPORATION<br>ZOMBA ENTERPRISES, INC.<br>ZOMBA SONGS, INC.<br>and<br>JIVE RECORDS<br>and<br>WRIGHT ENTERTAINMENT GROUP<br>and<br>BMG MUSIC PUBLISHING, INC., | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:   FILED JUN 05 2003 |
| Defendants. | : |

## DEFENDANTS' MOTION, PURSUANT TO 17 U.S.C. § 505, FOR AN AWARD OF COSTS AND ATTORNEYS' FEES

Defendants hereby move this Court, pursuant to 17 U.S.C. § 505, for an Order awarding them costs and attorneys' fees. In support of their Motion, defendants rely on the Declaration of Michael T. Mervis, and the accompanying Memorandum and exhibits.

Vincent V. Carissimi
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Michael T. Mervis (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
(212) 969-3000

Date:  June 5, 2003                    *Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL COTTRILL<br>and<br>LAWRENCE E. WNUKOWSKI | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| vs. | : | NO. 02-CV-3646 |
| | : | |
| BRITNEY SPEARS<br>and<br>ZOMBA RECORDING CORPORATION<br>ZOMBA ENTERPRISES, INC.<br>ZOMBA SONGS, INC.<br>and<br>JIVE RECORDS<br>and<br>WRIGHT ENTERTAINMENT GROUP<br>and<br>BMG MUSIC PUBLISHING, INC., | : | |
| Defendants. | : | |

FILED JUN 0 5 2003

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION, PURSUANT TO 17 U.S.C. § 505,
## FOR AN AWARD OF COSTS AND ATTORNEYS' FEES

## TABLE OF CONTENTS

**Page**

Preliminary Statement ...................................................................................................................1

Factual and Procedural Background .............................................................................................2

Argument ......................................................................................................................................10

I.      Defendants Are the Prevailing Parties ...............................................................................10

II.     Defendants Are Entitled To An Award Of Costs And Fees................................................10

        A.      The Applicable Standards .......................................................................................10

        B.      The Facts Of This Case Warrant An Award Of Costs And Attorneys' Fees..........11

                1.      Plaintiffs' Claims Were Objectively Unreasonable .............................11

                2.      Plaintiffs' Motives Were Questionable, At Best...................................14

                3.      An Award Here Will Advance Considerations Of Compensation
                        And Deterrence ....................................................................................16

        C.      The Relative Means Of The Parties Is Not Relevant To The Issue
                Of Whether There Should Be An Award Of Costs And Fees .................................17

III.    The Amount Of Costs And Attorneys' Fees Requested Is Reasonable .............................17

Conclusion....................................................................................................................................19

# TABLE OF AUTHORITIES

## CASES

Page

*Budget Cinema, Inc. v. Watertower Assocs.*, 81 F.3d 729 (7th Cir. 1996) ..................................14

*Broadcast Music, Inc. v. Xanthas, Inc.*, 685 F. Supp. 134 (E.D. La. 1988)................................19

*Cohen v. Va. Elec. & Power Co.*, 617 F. Supp. 619 (E.D. Va. 1985),
    *aff'd and appeal dismissed*, 788 F.2d 1137 (4th Cir. 1987) ......................................................16

*Coles v. Wonder*, 283 F.3d 798 (6th Cir. 2002)........................................................................15

*Diamond Star Bldg. Corp. v. Freed*, 30 F.3d 503 (4th Cir. 1994) ................................................14

*Diamond v. AM-Law Pub'g*, 745 F.2d 142 (2d Cir. 1984) .........................................................14

*Earth Flag Ltd. v. Alamo Flag Co.*, 154 F. Supp. 2d 663 (S.D.N.Y. 2001) ................................16

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)......................................................................10, 11

*Liberty Mut. Ins. Co. v. Employee Resource Mgmt., Inc.*, 176 F. Supp. 2d 510 (D.S.C.
    2001)........................................................................................................................................19

*Lieb v. Topstone Indus., Inc.*, 788 F.2d 151 (3rd Cir. 1986) .................................................10, 11

*MiTek Holdings, Inc. v. Arce Eng'g Co.*, 198 F.3d 840 (11th Cir. 1999) ....................................17

*N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250 (9th Cir. 1992) ...........................18

*Williams v. Crichton*, 891 F. Supp. 120 (S.D.N.Y. 1994), *aff'd*, 84 F.3d 581 (2d Cir.
    1996)........................................................................................................................................11

## STATUTES

17 U.S.C. § 505............................................................................................................................10, 18

Defendants respectfully submit this memorandum of law in support of their motion for an award of costs, including attorneys' fees, as "prevailing parties" under Section 505 of the Copyright Act, 17 U.S.C. § 505.

## Preliminary Statement

As a consequence of this Court's grant of summary judgment in their favor, defendants are prevailing parties within the meaning of Section 505 of the Copyright Act.  An award of costs and fees to defendants under Section 505 is warranted in this case based on (at least) the following facts, none of which can be fairly disputed:

- Shortly after commencing this action, and before any defendant had appeared or answered, plaintiffs moved for leave to immediately take the deposition of defendant Britney Spears in the Philadelphia area while, as plaintiffs acknowledged in their motion, she was in the middle of a nationwide concert tour.  Plaintiffs did this notwithstanding that, as is apparent from the liner notes accompanying the allegedly infringing CD in this case, she was neither a writer nor a producer of the two songs that were alleged to be infringing.

- Early on, plaintiffs publicized their claims against Ms. Spears in the media, and plaintiffs' counsel continues to claim on their web site that plaintiffs had "their copyrighted song stolen by Britney Spears."  Even if plaintiffs or their counsel had once believed, or still do believe, in the merits of plaintiffs' copyright infringement claim, they knew (and still know) that Ms. Spears played no part in the songwriting process.

- Plaintiffs' complaint clearly and intentionally suggests that plaintiffs had engaged and received a favorable opinion from a musicologist prior to commencing this action. This, however, was apparently not the case.

- Plaintiffs articulated an incorrect legal standard to the neophyte expert they finally did retain *after* filing suit, advising him that if he could use that standard to arrive at a particular conclusion, plaintiffs could then get to a jury or achieve a settlement. Although the expert obliged plaintiffs, the conclusion he reached at plaintiffs' behest was, as the Court correctly found, legally irrelevant.

- Plaintiffs brought and maintained a claim that *two* songs from Ms. Spears' album infringed their alleged song, notwithstanding that they had no coherent theory of how the *separate* teams of Swedish songwriters and producers for the *different* songs *both* came to have access to plaintiffs' alleged song.  Indeed, plaintiffs maintained their claim of access even after the central character in their incomplete theory of access, William

Kahn, testified in the clearest possible terms that he not only did not give a copy of their alleged song to defendants, he did not provide a copy of it to anyone in the world ever.

- Plaintiffs claimed from the outset that one of the allegedly infringing songs on Ms. Spears' album, *Can't Make You Love Me*, was "virtually identical" to plaintiffs' alleged song. After forcing defendants to defend that claim and move for summary judgment on it, plaintiffs dropped the claim without any excuse or explanation.

- When faced with irrefutable evidence that the melody of *What U See (Is What U Get)* was written and recorded prior to the time plaintiffs alleged in their complaint that access was possible, plaintiffs -- instead of dropping their claims -- radically altered them by asserting that defendants could have had access to a lyric-less earlier version of their alleged song (even though that was contrary to what they had alleged in their complaint and they had already admitted that this version had "nothing to do" with the allegedly infringed version of their song). Likewise, after their purported expert was exposed in defendants' summary judgment motion to be offering legally irrelevant opinions, plaintiffs sought to support their claims of alleged similarity with a misleading CD that proved nothing relevant about copyright infringement. The Court properly rejected these theories in its summary judgment ruling.

What this shows is that, at best, the merits of plaintiffs' claims, and the sincerity of their motives, were dubious from the outset, and became more suspect as the litigation progressed. Given this and the need for both compensation and deterrence here, an award of costs and fees is plainly warranted. Moreover, although the amount of the award sought is not insubstantial, it is clearly reasonable in light of the amount of work that was indisputably required for defendants to achieve a summary judgment here, coupled with the fact that, in consideration and anticipation of a claim that plaintiffs have limited financial means, defendants are seeking an amount that is significantly less than that which they have actually incurred. The motion should be granted in its entirety.

### Factual and Procedural Background

In May 2000, the Britney Spears album "Oops . . . I Did It Again!" was released. Two of the songs on that album were *What U See (Is What U Get)* and *Can't Make You Love Me*. The liner notes accompanying the CD (Ex. 4 to the accompanying declaration of Michael T. Mervis ("Mervis Decl.")) credit the songwriters and producers for *What U See (Is What U Get)* as Jörgen Elofsson, David Kreuger, Per Magnusson and Rami Yacoub, and for *Can't Make You Love Me* as Andreas Carlsson, Kristian Lundin, Martin Sanberg (p/k/a Max Martin) and Jacob Schultze. Ms. Spears is not identified as a writer or producer of either track.

Plaintiffs filed their complaint on June 7, 2002. *That same day*, plaintiffs were quoted in an article about the case that appeared in the *Philadelphia Daily News*.[1]  Mr. Cottrill claimed in the article that he was "devastated" because plaintiffs thought they "were going to get a fair deal off these people [defendants]."  Mr. Wnukowski was quoted as saying "I feel we got robbed."  Throughout the pendancy of the action, and as recently as yesterday, the web site promoting plaintiffs' lawyers contained the headline: "Bochetto & Lentz Retained by 2 Artists who had Copyrighted Song Stolen by Britney Spears."[2]

On June 18, 2002, before any defendant had appeared or answered the complaint, plaintiffs filed a motion to take Ms. Spears' deposition.[3]  In that motion, plaintiffs acknowledged that Ms. Spears was in the middle of a national concert tour, but nonetheless requested to take her deposition that month or in early July while her tour was visiting the Philadelphia area.[4]

In their complaint, plaintiffs alleged that "a side by side *musicological analysis* of the two infringing songs demonstrates willful infringement of plaintiff's [sic] music right down to the unique details in the beginning of the song with a computer generated 'reverse symbol' sound."[5]  This allegation was no doubt intended to imply, and in fact does clearly suggest, that plaintiffs had consulted and received a favorable opinion from a qualified musicologist before filing their complaint.  Yet, Mr. Cottrill's stated in his deposition testimony that the only

---

[1] *See* Mervis Decl. Ex. 5.

[2] *See* Mervis Decl. Ex. 6.  Notably, the web site specifically identifies *Ms. Spears* as a thief, notwithstanding that both the liner notes plaintiffs should have examined prior to filing suit and the discovery provided during the litigation make clear that she was neither a writer nor a producer of the allegedly infringing songs.

[3] *See* Mervis Decl. Ex. 7.

[4] *Id.*

[5] Complaint ¶ 27 (emphasis supplied).

"musicologist" he was aware of plaintiffs ever consulting was their alleged expert, J. Marshall Bevil.[6] And, as Dr. Bevil confirmed in his testimony, he was not even consulted by plaintiffs until late September 2002, months *after* plaintiffs' complaint was filed.[7] As Dr. Bevil's testimony also confirmed, he had *never* been retained by anyone before to offer an expert opinion in a copyright infringement case, and had never before offered an opinion as to infringement in *any* context.[8]

On October 17, 2002, shortly after their first consultation with Dr. Bevil, plaintiffs' counsel sent him a letter stating, in relevant part, that "if we can demonstrate that the average lay listener would find the songs to be similar, we can get to a jury or settle the matter favorably."[9]  Dr. Bevil, the neophyte, followed plaintiffs' lead: he stated in his report that "the Cottrill and Zomba songs . . . are strikingly similar, although not identical, from a musical (as distinct from textual) standpoint, resulting in their sounding very much the same to the *average lay listener* who perceives them aurally rather than reading them from notation."[10] Unfortunately for plaintiffs, their prompting of Dr. Bevil was misguided:  as this Court correctly held, Dr. Bevil's opinion on what the "average lay listener" perceives "does not aid the trier of fact . . . ."[11]

---

[6] *See* Deposition of Michael Cottrill, ("Cottrill Trans."), p. 135, l. 11 – 15.  Mervis Decl. Ex. 8.

[7] *See* Deposition of J. Marshall Bevil, ("Bevil Trans."), p. 46, l.  11-15.  Mervis Decl. Ex. 9.

[8] *Id.*, p. 35, l.  11- p. 36, l. 7.

[9] October 17, 2002 letter from Gavin P. Lentz to J. Marshall Bevil, Mervis. Decl. Ex.10.

[10] May 22, 2003 Memorandum and Order at 17.

[11] *Id.* at 17.

Plaintiffs' theory of access rested primarily on William Kahn, to whom plaintiffs gave a copy of their song and who previously had a relationship with Ms. Spears and, at the time plaintiffs provided him with a copy of their song, had a relationship with Jive Records, Ms. Spears' record label.[12] On January 27, 2003, Mr. Kahn was deposed by plaintiffs.  Mr. Kahn testified, repeatedly and emphatically, that he had not given a copy of plaintiffs' tape to *anyone*, let alone anyone connected with defendants.  Mr. Kahn also testified that he had *told* plaintiff Cottrill this fact *prior to the filing of the lawsuit*:

> A.      . . . So I made it very clear to Michael [Cottrill] that I did not send that song to Jive Records, and if he was planning on doing anything in any legal way -- and I made this extremely clear to Mike [Cottrill].
>
> And I also want to say that throughout the year leading up to the making of Britney Spears' album where Mike [Cottrill] had asked me on several different occasions to send the song to Jive Records -- and I repeatedly told him that I not only did not, I would not send the song to Jive because I did not think it was a good song. . . . ¶[13]
>
> And I did say to him [Cottrill], I made it very clear that I did not send that song in. . . . -- and the lawsuit [Complaint] unfortunately inaccurately gives the impression when it says in one of the paragraphs that they [plaintiffs] might have incorrectly told you [plaintiffs' counsel] as their lawyers that I promised to give Jive Records, or whoever, songs of theirs [plaintiffs]. . . . ¶[14]
>
> I repeated it very clearly, in case he [Cottrill] didn't hear me for the fifth time throughout the period of a year, that I did not send that song, [and] don't pursue that angle, whatsoever.  Do not include me in this circumstance, whatsoever, because it also gives the appearance that maybe I'm part of your scam. . . .[15]

---

[12] *See* Complaint, ¶¶ 13 - 17.

[13] Deposition of William Kahn ("Kahn Trans."), p. 91, l. 20 – p. 92, l. 10.  Mervis Decl. Ex. 11.

[14] *Id.*, p. 93, l. 5 - 7; l. 20 – p. 94, l. 2.

[15] *Id.*, p. 96, l. 22 – p. 97, l. 6.

Notwithstanding this testimony, and despite that Mr. Cottrill himself admitted Mr. Kahn never told him that he (Kahn) had sent a copy of plaintiffs' alleged song to Jive,[16] plaintiffs persisted for many months thereafter with both this lawsuit and, specifically, their claim that defendants obtained access to their alleged song through Mr. Kahn. They did so not only in the face of this testimony, but also notwithstanding that -- even assuming Kahn lied and that he actually gave a copy of plaintiffs' alleged song to Jive -- plaintiffs never offered a coherent theory as to how the two different teams of writers and producers of the two songs at issue *both* obtained copies of plaintiffs' alleged song in Sweden. Indeed, plaintiffs either realized or should have realized the inherent weakness in any claim that the writers and producers involved copied plaintiffs' alleged song. A simple search on the Internet reveals that: (1) they are located in Sweden; (2) they had worked on other songs for Ms. Spears in the past; and (3) several of them had a substantial track record of commercial success with Ms. Spears and/or other well-known recording artists.[17] In other words, plaintiffs either knew or should have known how unreasonable their claim was given that: (1) there was no basis to believe or assert (nor *did* plaintiffs assert) that there was a relationship between Mr. Kahn and any of the Swedish writers and producers, much less *both* teams of them; and (2) there was no reason for either team of successful writers and producers to jeopardize their established professional reputations or relationship with an artist of Mr. Spears' stature by copying from plaintiffs.

What is more disturbing is Mr. Kahn's testimony about Mr. Cottrill's decision to sue:

---

[16] Cottrill Trans. p. 52, l. 5 - 15.

[17] See biographical information about the songwriters and producers available on the Internet, Mervis Decl. Ex. 13.

A:      . . . Mike Cottrill, specifically as I recall, contacted me and inquired of me if I had sent the song to Jive because - - and interestingly enough, there was a song on her album that had a similar song title - - he wondered if I had sent that song.

This was about a week before the album had come out. And I believe, as I actually recall him telling me, his daughter . . . was on an Internet, on a Britney Spears web site and saw information about her album that was going to be released the next week.

It had song titles listed on this web site and one of them was a song with a similar title to that. . .

It was at that point in time, and this was a week before, and he seemed skeptical because of what he thought was going on and knew he had given me a copy of the cassette and asked me if I had sent it.

And at that time, I told him, no, I didn't.

And then I actually asked him if he heard the song, if they were similar.

And he said, no, because there weren't any songs on the web site; it was just the title . . .[18]

Thus, as Mr. Kahn's testimony makes clear, plaintiff Cottrill was already contemplating bringing this suit before he even heard the song.

To be sure, Mr. Cottrill denied this. Still, his testimony on the point reveals an obvious motive for bringing and maintaining plaintiffs' claims, notwithstanding their obvious lack of merit. Specifically, Mr. Cottrill testified that Mr. Kahn told him:

A.      . . . - - if you [Cottrill] can get an attorney - - he [Kahn] was talking something about they had a slush fund, if you get an attorney, you can, you know - - you should get an attorney and sue . . .

Q.      He [Kahn] said who had a slush fund, the record company?

A.      Yeah, Billy.

---

[18] Kahn Trans. p. 88, l. 18 – p. 90 l. 21.

Q.      I think he was misinformed.

A.      I don't know that.  We have to see.[19]

On April 14, 2003, defendants filed their motion for summary judgment, which: (1) documented the fact that the allegedly infringing songs had been written and recorded prior to the date on which plaintiffs alleged in their complaint that access to their alleged song was possible; and (2) demonstrated the failure of plaintiffs to come forward with any relevant evidence of similarity, including through the opinions of Dr. Bevil.  Rather than acknowledge at this point that their case was without merit, plaintiffs persisted with their claim that *What U See (Is What U Get)* infringed their alleged song, arguing on the issue of access that defendants could have had access to an earlier, instrumental version of their song.  Plaintiffs argued this despite that: (1) Cottrill had already testified under oath that this instrumental version had "nothing to do" with the claims in the lawsuit;[20] and (2) plaintiffs' complaint alleges very clearly that they did *not* give a copy of the allegedly infringed music to anyone until *after* it was registered with the Copyright Office in late November 1999 (*i.e.*, *after* the allegedly infringing melody had been written and recorded).[21]  Plaintiffs also contended, for the first time, that unspecified changes in the melody could have been made *after* it was written and recorded.  On the issue of similarity, plaintiffs suddenly offered a CD containing versions of the allegedly infringed and infringing songs mixed together as evidence of alleged copying.  As for *Can't Make You Love Me*, without any explanation and after putting defendants to the expense of discovery, an expert analysis and summary judgment briefing, plaintiffs withdrew their claim

---

[19] Cottrill Trans. p. 128 l.23 – p. 129 l. 11.

[20] Cottrill Trans. p. 49, l. 8 – p. 50, l.5.

[21] *See* Complaint ¶¶ 17-18.

of infringement.[22]  They did so notwithstanding the unambiguous allegation in their complaint that *Can't Make You Love Me* "is *virtually identical* to the music in plaintiffs' copyrighted song *'What You See Is What You Get'* with respect to the unique rhythm, cords [sic], notes, arrangements of the notes and overall theme and motif."[23]

On May 22, 2003, this Court granted summary judgment in favor of defendants, rejecting plaintiffs' newly-minted arguments.  As for the phantom early "instrumental version," the Court relied on Cottrill's admission that it "was not the same as the song at issue in this action" and that there was no evidence to support the contention that it had the same melody as the copyrighted version of the song.[24]  As for the theory that the creators of the song might have made changes to its melody after the melody had been written and recorded, the Court correctly noted that it could not find a triable issue of fact on this basis without "impermissibly weigh[ing] the credibility of the songwriters sworn testimony and improperly rely[ing] on mere speculation that the melody could have been changed after Ms. Spears competed the vocals in November 1999."[25]  Finally, as to plaintiffs' reliance on the CD containing the mixed versions of the songs at issue, the Court correctly found that "the comparison offered by Plaintiffs' CD is unhelpful under the extrinsic test and only further demonstrates the necessity to dissect the works in question,"[26] something which plaintiffs and their purported expert utterly failed to do.

---

[22] May 22, 2003 Memorandum and Order at n.1.

[23] Complaint ¶ 25.

[24] May 22, 2003 Memorandum and Order. at 14-15.

[25] *Id.* at 14.

[26] *Id.* at 18.

Argument

I.      **Defendants Are the Prevailing Parties**

Section 505 of the Copyright Act provides that, in civil copyright actions, the Court may "allow the recovery of full costs by or against any party" and may "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. In awarding attorneys' fees, the Court is to treat prevailing defendants in the same manner as it treats prevailing plaintiffs. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994) ("Prevailing plaintiffs and prevailing defendants are to be treated alike"). Where, as here, a defendant is granted summary judgment dismissing a claim of copyright infringement, the defendant is the prevailing party under Section 505. *See Lieb v. Topstone Indus., Inc.*, 788 F.2d 151 (3d Cir. 1986) (reversing denial of grant of attorneys fees to defendant who prevailed on summary judgment in copyright infringement case and remanding for further proceedings).

II.     **Defendants Are Entitled To An Award Of Costs And Fees**

        A.      **The Applicable Standards**

Although "[t]here is no precise rule or formula" for determining whether the Court, in its discretion, should award costs and attorneys' fees to a prevailing party, the Supreme Court, citing the Third Circuit, has held that the court's "equitable discretion" to award costs and fees should be exercised in light of various non-exclusive factors. *Fogerty*, 510 U.S. at 534 n.19. Those factors include: (1) frivolousness; (2) motivation; (3) objective unreasonableness (both in the factual and legal components of the case); and (4) the need in particular circumstances to advance considerations of compensation and deterrence. *Id.*, citing *Lieb*.

Significantly, in order to award costs and fees, the Court need *not* find that the lawsuit was frivolous, that the plaintiff acted in bad faith, that the plaintiff was blameworthy or that

10

exceptional circumstances exist. *See, e.g., Fogerty,* 510 U.S. at 527, 532-33 (rejecting argument

that attorneys' fees award to a defendant "represents a penalty imposed upon the plaintiff for

institution of a baseless, frivolous, or unreasonable suit, or one instituted in bad faith" as "too

narrow a view of the purposes of the Copyright Act"); *Lieb,* 788 F.2d at 155 ("We think that

limiting assessments to those cases where bad faith is shown unduly narrows the discretion

granted to the district judges"); *Williams v. Crichton,* 891 F. Supp. 120, 121 (S.D.N.Y. 1994) ("bad

faith or frivolousness is not a prerequisite to an award").

     **B.**       **The Facts Of This Case Warrant An Award Of Costs And Attorneys' Fees**

           **1.**       **Plaintiffs' Claims Were Objectively Unreasonable**

      Even though the Court need not find that plaintiffs' claims were objectively

unreasonable in order to award defendants their costs and fees, there is a substantial basis in

this case to support such a finding. The Court's conclusion that there was no triable issue of fact

on either the issue of access or similarity was undeniably correct. With respect to access,

although plaintiffs did give Mr. Kahn a copy of their alleged song and Mr. Kahn did have some

relationship with defendants, this hardly made plaintiffs' original allegations of access

objectively reasonable. To begin with, Mr. Kahn testified that he told plaintiff Cottrill, prior to

the commencement of this lawsuit, the he (Kahn) did not give plaintiffs' alleged song to

defendants. And Mr. Cottrill admitted that Mr. Kahn never told him (Cottrill) anything to the

contrary. Thus, before bringing this lawsuit, plaintiffs had nothing but their own subjective

belief as a basis for claiming that Kahn had, in fact, passed their alleged song on to any

defendant.

      Moreover, at the time that plaintiffs filed their complaint, they either knew or should

have known that none of the defendants were themselves involved in the creation of the

allegedly infringing songs, but rather that the songs had been created by well-known and successful songwriters who lived half-a-world away from Philadelphia.  Plaintiffs had no reason to believe (and have never even asserted) that Mr. Kahn had any relationship with the Swedish writers or producers, nor did plaintiffs have any basis upon which to conclude that these individuals would put their established professional reputations and relationship with Ms. Spears in jeopardy by copying plaintiffs' song.

Plaintiffs' theory of access was even more untenable insofar as they alleged that two *different* songs by two *separate* teams of songwriters and producers were infringing.  Plaintiffs never offered any theory as to how *both* sets of songwriters and producers came to have access to plaintiff's alleged song or why *both* of these distinct teams *separately* decided to copy from plaintiffs.

Finally, whatever basis plaintiffs may have had for believing, prior to bringing suit, that Mr. Kahn was somehow a conduit for defendants to obtain access to plaintiffs' alleged song, it most certainly vanished in January 2003, when plaintiffs deposed Mr. Kahn and heard his emphatic testimony that he never provided a copy of plaintiffs' alleged song to anyone in the world ever.

As to alleged similarity, the claims in plaintiffs' complaint of purported "virtual identity"[27] and supposed infringement of a "unique" title,[28] and the claim that defendants "merely made minor adjustments to some of the music and lyrics in the respective songs in an

---

[27] Complaint ¶ 25.

[28] *Id.* ¶ 24.

unsuccessful attempt to 'conceal' their pirating of plaintiffs' copyrighted music,"[29] were unquestionably unreasonable. *None* of these things were true when alleged. Particularly disturbing was the intentional implication in plaintiffs' complaint that these assertions were based on a "musicological analysis."[30] Although this allegation was no doubt included to imbue plaintiffs' claims with an aura of legitimacy, it was apparently untrue, at least according to Mr. Cottrill, who was not aware of any pre-filing consultation with a musicologist. Indeed, it was itself objectively unreasonable for plaintiffs to have brought their claims without having first obtained a favorable opinion from a qualified musicologist, particularly because, as the Court correctly held, "the similarities between the two songs would not lead a reasonable juror to concluded that the creators of Defendants' song copied Plaintiffs' work."[31]

Also indicative of the objectively unreasonable nature of plaintiffs' claims was the manner in which plaintiffs conducted the litigation after it was commenced. Plaintiffs:

- Urged their neophyte expert to reach a conclusion based on a suggested legal standard that, as this Court correctly found, in not properly the subject of expert testimony.

- Persisted with their claim that defendants obtained access to plaintiffs' alleged song through Mr. Kahn even after he testified to the contrary and without any legitimate basis for believing that his testimony was untruthful.

- Litigated their claim against the supposedly "virtually identical" *Can't Make You Love Me* throughout the entirety of the case, only to drop it -- *after* defendants had spent time and money in discovery, expert analysis and summary judgment briefing -- without any explanation or apology.

- Pursued, in opposition to defendants' summary judgment motion, the new theory that defendants could have gained access to an earlier instrumental version of plaintiffs' song

---

[29] *Id* . ¶ 26.

[30] *Id* . ¶ 27.

[31] May 22, 2003 Memorandum and Order at 19.

-- notwithstanding that it was a version that plaintiff Cottrill himself testified had "nothing to do with" the claims in the lawsuit.

Again, although the Court need not find that plaintiffs' claims were objectively unreasonable in order to grant this motion, such a finding is wholly supported by the record and strongly argues in favor of an award of costs and fees here. *See, e.g., Budget Cinema, Inc. v. Watertower Assocs.*, 81 F.3d 729, 733 (7th Cir. 1996) ("[W]e are convinced that the district court abused its discretion by failing to award attorney's fees based on the objective unreasonableness of [plaintiff's] complaint"); *Diamond Star Bldg. Corp. v. Freed*, 30 F.3d 503, 506 (4th Cir. 1994) ("[W]hen a party has pursued a patently frivolous position, the failure of a district court to award attorney's fees and costs to the prevailing party will, except under the most unusual of circumstances, constitute an abuse of discretion"); *Diamond v. AM-Law Pub'g*, 745 F.2d 142, 148 (2d Cir. 1984) (awarding fees where plaintiff's copyright claim was "wholly without merit").

### 2.    Plaintiffs' Motives Were Questionable, At Best

The reason why plaintiffs brought and maintained their objectively unreasonable claim seems clear -- there is ample evidence to suggest that plaintiffs sought to obtain a settlement from the deep-pocket defendants, including by publicizing the allegation that Ms. Spears, a well-known celebrity, "stole" their alleged song, and seeking to use the discovery process to harass her. Mr. Kahn testified that Mr. Cottrill contemplated bringing suit based on the similar song titles alone, and before he had even heard *What U See (Is What U Get)*. And Mr. Cottrill testified to learning, before he filed suit, about a "slush fund" that record companies supposedly use to settle lawsuits such as this one.

On the very day that they brought this suit, plaintiffs received media attention about it, including being interviewed (apparently before the suit was even filed) by a local daily

14

publication.  Plaintiffs complained in that article that they were "devastated" and had been "robbed."

Less than two weeks later, before any defendant had even appeared or answered, plaintiffs sought to procure Ms. Spears' deposition on an emergency basis.  In fact, they intentionally sought to disrupt her then national tour by demanding the deposition within a few weeks' time while her tour visited the Philadelphia area.  There was utterly no basis for this request, particularly given that, as the liner notes accompanying her CD indicate, she neither wrote nor produced either of the songs that plaintiffs then claimed were infringing.  In other words, Ms. Spears had nothing to tell plaintiffs and there was certainly no legitimate reason for plaintiffs to seek to interrupt her tour with a deposition at a time when no defendant had even appeared or answered in the case.  Nor, obviously, has there ever been any basis for plaintiffs' counsel to advertise on their web site that Ms. Spears, *personally*, "stole" plaintiffs' alleged song.

Only one inference can reasonably be drawn from this conduct:  plaintiffs were, at best, less interested in vindicating their rights than in using this litigation as a means of pressuring defendants into offering a settlement of a claim that had no merit.  Such conduct militates substantially toward an award of costs and fees.  *See, e.g., Coles v. Wonder*, 283 F.3d 798, 803 (6th Cir. 2002) (upholding an award of fees under Section 505 against plaintiff who sued celebrity Stevie Wonder for copyright infringement and went on a local television show to "accuse[] Wonder of stealing Plaintiff's song . . . .  [I]n light of the fact that this case was objectively unreasonable, the tactics and strategies pursued by Plaintiff and his attorneys can be interpreted as seeking to force a settlement with a wealthy songwriter with little or no basis for doing so").

15

### 3. An Award Here Will Advance Considerations Of Compensation And Deterrence

Finally, advancing the need for compensation and deterrence are important considerations in this case. As set forth in Point III, *infra*, plaintiffs pursued this case aggressively and defendants were forced to devote considerable resources, and were put to considerable expense, in defending the action. None of these costs should have been incurred, and compensation of the portion of these expenses sought by defendants on this motion is appropriate here.

Moreover, there is a also clear need for deterrence. Record companies, music publishers and well-known recording artists are all-too-frequently the targets of frivolous or unreasonable lawsuits. Plaintiffs often see a simple coincidence, such as the similarity of a song title (that consists of a common phrase), and use it as a means to leverage a settlement with a large or successful defendant. Such suits should plainly be discouraged, and an award here would serve the salutary purpose of demonstrating to both plaintiffs here and other would-be plaintiffs that claims such as this one cannot be pursued without the risk of significant financial consequences. *See, e.g., Earth Flag Ltd. v. Alamo Flag Co.*, 154 F. Supp. 2d 663, 668 (S.D.N.Y. 2001) ("This case presented a straightforward copyright infringement claim that was objectively unreasonable. . . . . Failing to award attorneys' fees to defendants in such situations would invite others to bring similarly unreasonable actions without fear of any consequences"). *See also Cohen v. Va. Elec. & Power Co.*, 617 F. Supp. 619, 623 (E.D. Va. 1985) ("Though there was no objective bad faith in instituting the action, and I suspect there was no subjective bad faith, nevertheless plaintiff caused defendant considerable expense and trouble in plaintiff's losing cause. In other words, plaintiff lost and deserved to lose and there is no reason why the

discretion of the Court should not be exercised to award fees in accordance with the provisions of the statute"), *aff'd and appeal dismissed*, 788 F.2d 247 (4th Cir. 1987).

### C.   The Relative Means Of The Parties Is Not Relevant To The Issue Of Whether There Should Be An Award Of Costs And Fees

In opposing this motion, plaintiffs will likely counter that they are struggling songwriters who cannot afford an award of costs and fees against them, whereas defendants have comparatively greater financial means. The law is clear, however, that although it may be a consideration as to the *amount* of an award, the relative means of the parties is *not* relevant to the question of *whether* an award of fees should be made. In fact, "in determining whether to award attorney's fees under § 505, the district court *should consider not* whether the losing party can afford to pay the fees but whether imposition of fees will further the goals of the Copyright Act." *MiTek Holdings, Inc. v. Arce Eng. Co.*, 198 F.3d 840, 843 (11th Cir. 1999) (emphasis supplied). For the reasons set forth directly above, an award of costs and fees in this matter will indeed further the goals of the Copyright Act, as articulated by the Supreme Court and the Third Circuit. Thus, there should be an award notwithstanding the parties' differing economic positions.

### III.   The Amount Of Costs And Attorneys' Fees Requested Is Reasonable

This lawsuit was filed in June 2002 and continued for close to a year before summary judgment was granted to defendants. As is apparent, during that time plaintiffs prosecuted their claims with vigor, and defendants defended with equal diligence. Counsel for defendants performed at least the following necessary legal work, all of which resulted in expense to defendants:

- review and analysis of plaintiffs' complaint;

- preparation of defendants' answer to the complaint;

- legal research concerning the claims advanced by plaintiffs in their complaint;

- correspondence and discussions with defendants and/or their representatives and with plaintiffs' counsel;

- review and analysis of, and preparation of responses to, plaintiffs' discovery requests, including the review and production of documents in response to plaintiffs' discovery requests;

- preparation of defendants' discovery requests to plaintiffs and review and analysis of plaintiffs' responses and documents produced by plaintiffs;

- review and analysis of the extensive and esoteric reports prepared by plaintiffs' purported expert musicologist, Dr. Bevil;

- consultation with defendants' expert musicologist, Anthony Ricigliano, concerning Dr. Bevil's reports and the preparation of Mr. Ricigliano's expert reports;

- preparation for and participation in the depositions of six fact witnesses and two expert witnesses; and

- preparation of defendants' summary judgment motion, preparation for and participation in oral argument on the motion, and preparation of defendants' supplemental filing in support of the summary judgment motion.[32]

Although the total amount sought by defendants on this motion, $141,556.05, is not insubstantial, the amount is nonetheless reasonable in view of the duration of the litigation, the level of activity required, the amount of claimed damages and defendants' ultimate success in the case. *See, e.g., N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 253(9th Cir. 1992) ("In deciding a reasonable attorney's fee, courts should consider the amount of work, the skill employed, damages at issue, and the result achieved") (internal quotations omitted).

Moreover, in recognition of the relative means of the parties, defendants are only seeking an award of the fees (not the costs and disbursements) incurred in connection with the

---

[32] *See* Mervis Decl. ¶ 7.

services rendered by Proskauer Rose LLP through April 2003, discounted by 30% to approximate the hourly billing rates of comparable Philadelphia-area counsel, and the costs incurred in connection with the services rendered by Mr. Ricigliano's company and court reporting services.[33] Thus, defendants are not even seeking an award of: (1) *any* of the costs and disbursements billed to them by Proskauer Rose or the fees that will soon be billed to them by Proskauer Rose for services that were rendered in May 2003; or (2) *any* costs or fees incurred in connection with the professional services rendered by Pepper Hamilton, notwithstanding that there is ample authority for the recovery of fees charged by both local and out-of-town counsel.[34] The limited scope of defendants' application renders the amount sought all the more reasonable and appropriate.

## Conclusion

For all of the foregoing reasons, defendants respectfully submit that their motion for an award of costs and attorneys' fees, pursuant to 17 U.S.C. § 505, should be granted in its entirety.

Respectfully Submitted,

Dated: June 5, 2003
         Philadelphia, PA

Vincent V. Carissimi
PEPPER HAMILTON LLP
3000 Two Logan Square
18th and Arch Streets

---

[33] *Id.* ¶ 2. Notably, Proskauer Rose has significant prior experience representing the Zomba and BMG defendants in courts throughout the country, and serves as one of their principal outside litigation counsel. *Id.* ¶ 8. Given this fact and the prior experience of the Proskauer Rose attorneys who worked on this case (*id.* ¶¶ 9-10) , it would be appropriate for defendants to seek an award of Proskauer's fees at the full rate. Defendants have nonetheless determined not to do so in recognition of plaintiffs' likely claim that they have limited financial resources.

[34] *See, e.g., Broadcast Music, Inc. v. Xanthas, Inc.,* 685 F. Supp. 134, 136 (E.D. La. 1988); *Liberty Mut. Ins. Co. v. Employee Resource Mgmt., Inc.,* 176 F. Supp. 2d 510, 534 (D.S.C. 2001).

Philadelphia, Pennsylvania 19103-2799
(215) 981.4000

Michael T. Mervis (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
(212) 969-3000 (telephone)
(212) 969-2900 (facsimile)

*Attorneys for Defendants*

20

## CERTIFICATE OF SERVICE

I, Vincent V. Carissimi, hereby certify that on June 5, 2003, I caused a true and correct copy of the foregoing defendants' motion, pursuant to 17 U.S.C. § 505, for an award of costs and attorneys' fees and supporting memorandum of law to be served by Hand Delivery addressed to:

> Gavin Lentz, Esquire
> Bochetto & Lentz, P.C.
> 1524 Locust Street
> Philadelphia, PA 19102

Vincent V. Carissimi